IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – LAW DIVISION

| | | |
|---|---|---|
| BEN GORDON, G7, INC., and BG4, INC. ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| VITALIS PARTNERS, LLC; LARRY ) | No. | |
| HARMON & ASSOCIATES, P.A.; KCD ) | | |
| DEVELOPMENTS, LLC; LARRY ) | | |
| HARMON; and KENNY CRUZ ) | **JURY TRIAL DEMANDED** | |
| ) | | |
| Defendants. ) | | |

## COMPLAINT

NOW COME the Plaintiffs, BEN GORDON, G7, INC. and BG4, INC. (sometimes collectively referred to as "Mr. Gordon"), by and through his attorneys, SPELLMIRE & SOMMER, and complaining of the Defendants, VITALIS PARTNERS, LLC; LARRY HARMON & ASSOCIATES, P.A.; KCD DEVELOPMENTS, LLC; LARRY HARMON; and KENNY CRUZ, (collectively, "the Defendants") states as follows:

### INTRODUCTION

1. Ben Gordon, a professional basketball player for the Chicago Bulls, seeks recovery from his previous financial advisors and consultants who breached Mr. Gordon's trust and confidence by using his money for their advantage and by improperly taking a percentage of Mr. Gordon's income as a fee for services despite Mr. Gordon never agreeing to and expressing concern as to such an arrangement. Mr. Gordon's advisors, who were to be paid a set monthly


PLAINTIFF'S EXHIBIT 1

fee to act as his trusted financial advisors and have control over his funds and bank accounts, unilaterally began charging Mr. Gordon an excessive fee amounting to 1.5% of Mr. Gordon's total income. Further, Mr. Gordon's advisors used their position of trust to induce Mr. Gordon to apparently invest $1,000,000 in a real estate deal, but in reality his advisors used the money to acquire *their own* interest in this real estate and drew up a Promissory Note ("the Note") wherein the Defendants promised to re-pay the $1,000,000 they borrowed from Mr. Gordon to gain an interest in the real estate as well as interest at a rate of 17.5%. When Mr. Gordon discovered these indiscretions and demanded the repayment of his money, rather than simply paying back the money and agreeing to sever ties, his advisors refused to pay back the $1,000,000.

### PARTIES

2. Ben Gordon is an individual and a resident of Cook County, Illinois. Mr. Gordon makes his living as a professional basketball player and is employed by the Chicago Bulls.

3. BG4 Inc. ("BG4") is a Delaware corporation. Ben Gordon is the sole shareholder of BG4.

4. G7 Inc. ("G7") is a Delaware corporation. Ben Gordon is the sole shareholder of G7.

5. Ben Gordon, BG4 and G7 are sometimes collectively referred to as Mr. Gordon.

6. Vitalis Partners, LLC ("Vitalis") is a limited liability company organized under the laws of Delaware and its office is located at 2209 Plaza Drive, Suite 100, Rocklin California 95765. Vitalis' partners are Larry Harmon & Associates, P.A. and KCD Developments, LLC ("KCD"). Its shareholders are Larry Harmon and Kenny Cruz.

7. Larry Harmon & Associates, P.A. is a California corporation and its office is located at 2209 Plaza Drive, Suite 100, Rocklin California 95765.

8. KCD Developments, LLC is a limited liability company with its principal place of business in California.

9. Larry Harmon is an individual and a resident of the state of California.

10. Kenny Cruz is an individual and a resident of the state of California.

### THE CONSULTING AGREEMENT

11. On May 17, 2004 Ben Gordon executed an agreement drafted by Larry Harmon & Associates where in Larry Harmon and Larry Harmon & Associates (sometimes collectively referred to as "the Harmon Defendants") would act as his financial advisors and consultants and would specifically "provide detailed financial and tax consulting services for the duration of your playing career with the National Basketball Association ("NBA")." (The "Consulting Agreement," attached as Exhibit A).

12. The Consulting Agreement also provides that the Harmon Defendants had the "intent of being involved in every financial decision with [Mr. Gordon] so that we can appropriately gain any tax and/or financial advantages or savings on such expenditure or purchase."

13. The Consulting Agreement provides that during the duration of Mr. Gordon's rookie contract, he was to pay the Harmon Defendants $4,000 per month during his rookie season, $5,000 per month during his second season and $6,000 per month during his third and fourth seasons plus reasonable expenses.

14. The Consulting Agreement makes no mention of the Harmon Defendants taking a percentage of Mr. Gordon's salary as a fee, but rather provides that after the expiration of the rookie contract, "we will evaluate the amount of work that we have performed on your account and provide you with a new engagement letter at that time."

15. As a result of the Consulting Agreement and the Harmon Defendants' control over Mr. Gordon's financial affairs, Mr. Gordon's paychecks from the Chicago Bulls were deposited and wired into Mr. Gordon's accounts which were controlled by the Harmon Defendants.

16. Further, as a result of the Consulting Agreement and the Harmon Defendants' control over Mr. Gordon's financial affairs, Larry Harmon would travel to Chicago, Illinois to discuss certain investment opportunities and Mr. Gordon's fee arrangement with the Harmon Defendants with Mr. Gordon.

## THE PITCH TO INVEST IN A REAL ESTATE DEAL

17. Sometime in or around August of 2006, Larry Harmon contacted Mr. Gordon and informed Mr. Gordon that he should invest $1,000,000 in a real estate investment that would pay a large dividend after 24 months.

18. Larry Harmon stated that he was going to invest $1,000,000 of his own money in this real estate deal because the prospects were so promising.

19. On Larry Harmon's advice and suggestion, Mr. Gordon gave his consent for Larry Harmon to investment $1,000,000 in this real estate deal. In order to effectuate Mr. Gordon's $1,000,000 "investment," Larry Harmon convinced Mr. Gordon to allow him to take $750,000 of Mr. Gordon's funds and for Mr. Gordon to borrow the remaining $250,000.

## THE DISCOVERY OF THE HARMON DEFENDANTS' IMPROPER CONDUCT

20. In or around May of 2006, Larry Harmon contacted Mr. Gordon and indicated that he wanted to discuss changing the fee Mr. Gordon paid for the Harmon Defendants' services from the flat monthly fee to a percentage of Mr. Gordon's income.

21. Mr. Gordon never agreed either verbally or in writing to a change from the flat monthly fee to a percentage of his overall income as compensation for the Harmon Defendants' services. Rather, Mr. Gordon, on multiple occasions, expressed concerns and reservations about such an arrangement.

22. In the process of severing his relationship with the Harmon Defendants and transferring his funds to new advisors, it was discovered that rather than invest the $1,000,000 in real estate for the benefit of Mr. Gordon, the Harmon Defendants actually used Mr. Gordon's money to effectuate their own investment in this real estate deal.

23. In fact, and unbeknownst to Mr. Gordon, the Defendants papered the deal by drawing up a Promissory Note which evidenced Mr. Gordon's "loan" of $1,000,000 to the Harmon Defendants and the other Defendants for their investment in a real estate deal.

24. This led Mr. Gordon and his current advisors to demand repayment of the $1,000,000 used by the Harmon Defendants to effectuate the Defendants' investment into a real estate deal.

25. Further, in the process of severing his relationship with the Harmon Defendants and transferring his funds to new advisors, it was discovered that the Harmon Defendants had been charging Mr. Gordon a fee of 1.5% of his income for the services they provided for a number of months, despite failing to receive Mr. Gordon's authorization or consent to do so.

## THE PROMISSORY NOTE

26. On or about February 12, 2007, the Defendants apparently executed the Promissory Note ("the Note"), which is attached hereto as Exhibit B.

27. The Note memorializes that the Defendants "borrowed" $1,000,000 from Mr. Gordon and obligates the Defendants to re-pay the principle loan amount as well as interest at a rate of 17.5%.

28. The Note obligates the Defendants to pay Mr. Gordon $4,167.67 per month by the fifth day of each month as partial payment of the total 17.5% interest due.

29. The clause entitled **"Default"** provides:

Borrower will be in default if Borrower fails to make any payment within forty five (45) days of its due date. A late charge in the amount of three percent (3 %) of any payment required to be made hereunder shall be imposed on each such payment not received by the Lender within fifteen (15) days after it is due. The late charge is not a penalty, but liquidated damages to defray administrative and related expenses due to such late payment. The late charge shall be immediately due and payment shall by paid by the Borrower to Lender without notice or demand.

30. The clause entitled **"Expenses"** provides that:

All parties liable for the payment of this Note agree to pay the Lender all costs incurred by it in connection with the collection of this Note. Such costs include, without limitation, fees for the services of counsel and legal assistants (including bankruptcy counsel fees and expenses) employed to collect this Note, whether or not a suit is brought, and whether incurred in connection with collection, trial, appeal or otherwise.

31. The clause entitled **"Lender's Rights"** provides that:

Upon default, Lender may declare the entire unpaid principle on this Note and all accrued unpaid costs and fees immediately due, without notice, and then Borrower will pay that amount. Upon default, or if this Note is not paid at final maturity, Lender, at its option, may add any unpaid accrued costs and fees to principal and such sum will bear interest therefrom until paid at Eighteen Percent (18%) (the "Default Rate").

## COUNT I – BREACH OF CONTRACT (All DEFENDANTS)

32. Mr. Gordon re-alleges and incorporates by reference Paragraphs 1 through 31 as and for paragraph 32.

6

33. On February 12, 2007, the Defendants executed the Note, thereby contractually binding them to perform all of the obligations expressed in the Note, including the making of monthly payments to Mr. Gordon by the fifth day of each month thereafter in the amount of $4,167.67.

34. The Defendants failed to make any of the $4,167.67 in a timely manner in accordance with the express terms of the Note, and specifically for the months of March, April, May, June, and July of 2007.

35. On July 31, 2007 Mr. Gordon's current advisor wrote to Larry Harmon and indicated that the Note was in default and demanded repayment of the entire unpaid $1,000 principal balance, all accrued interest, costs and late fees.

36. At that time, the March, April, May, June and July $4,167.67 interest payments were all over forty-five days delinquent. Accordingly, the Note was in fact is in default in accordance with the Note's Default clause when Mr. Gordon, through his current advisor, exercised his rights under the Lender's Rights Clause.

37. To date, and despite Mr. Gordon having exercised his rights to declare a default under the Lender's rights clause, the Defendants have refused to return the $1,000,000 principal loan amount to Mr. Gordon.

Wherefore, Plaintiff Ben Gordon respectfully requests judgment in his favor and against all Defendants and for the recovery of the following damages:

(1) Re-payment of the $1,000,000 principle loan amount;

(2) Any and all delinquent interest payments that exist as of the date of the filing or arise during the course of this action;

(3) A 3% late charge on any delinquent interest payments that exist as of the date of the filing of this action or which arise during the course of this action;

(4) Interest at a rate of 18% for the accrued costs, fees, principle and all unpaid monthly interest payments until the date of judgment;

(5) Expenses and costs of suit as well as all attorneys' fees expended in the collection of the money due under the Note.

## COUNT II BREACH OF FIDUCIARY DUTY (HARMON DEFENDANTS)

38. Mr. Gordon re-alleges and incorporates by reference Paragraphs 1 through 37 as and for paragraph 38.

39. At all times pertinent, Mr. Gordon placed his complete trust and confidence in the Harmon Defendants in regards to his financial, investment, tax and business affairs. In particular, and without limitation:

    a.    The Harmon Defendants had vastly greater business experience than Mr. Gordon;

    b.    The Harmon Defendants had control over Mr. Gordon's monies and accounts;

    c.    Mr. Gordon disclosed complete and confidential personal financial information to the Harmon Defendants;

    d.    Mr. Gordon relied heavily on the Harmon Defendants for advice and assistance in his financial and business affairs;

    e.    Mr. Gordon entrusted the Harmon Defendants to invest purportedly $1,000,000 in a real estate deal based upon the Harmon Defendants' urging; and

    f.    The Harmon Defendants acted as Mr. Gordon's agent in regards to his financial and business affairs.

40. As a result of the trust and confidence reposed by Mr. Gordon, the Harmon Defendants gained influence and superiority over Mr. Gordon in regards to his financial, investment, tax and business affairs.

41. As a result of said trust and confidence Mr. Gordon placed with the Harmon Defendants and the Harmon Defendants knowledge that Mr. Gordon placed his trust and confidence in them; the Harmon Defendants owed a fiduciary duty to Mr. Gordon to fully disclose and accurately represent all facts relating to Mr. Gordon's finances, investments, taxes and business matters, as well as the facts regarding the fees charged by the Harmon Defendants

42. The Harmon Defendants further owed to Mr. Gordon a duty to act in Mr. Gordon's best interest and with good faith, loyalty and trust.

43. The Harmon Defendants breached said fiduciary duties owed to Mr. Gordon in one or more of the following respects:

   a. The Harmon Defendants charged Mr. Gordon an excessive fee amounting to 1.5% of his income without obtaining his authorization or consent;

   b. The Harmon Defendants charged Mr. Gordon a fee amounting to 1.5% of his income despite Mr. Gordon's execution of the Consulting Agreement which set only a monthly fee to be paid to the Harmon Defendants;

   c. The Harmon Defendants unilaterally changed their fee structure from a set monthly amount to a percentage of Mr. Gordon's overall income;

   d. The Harmon Defendants failed to disclose the true nature of the use of Mr. Gordon's $1,000,000 investment in the real estate deal;

   e. The Harmon Defendants used $1,000,000 of Mr. Gordon's money to obtain their own interest in a real estate deal;

   f. The Harmon Defendants misrepresented to Mr. Gordon the actual use of the $1,000,000 that was purportedly to be used for Mr. Gordon's acquiring an interest in real estate; and

   g. The Harmon Defendants refused to return the $1,000,000 principle loan amount to Mr. Gordon despite being in default under the Promissory Note which they had drafted.

44.  One or more of the above wrongful acts or omissions and breaches of fiduciary duties committed by the Harmon Defendants was a direct and proximate cause of the injuries described herein and suffered by Mr. Gordon.

45.  But for the wrongful acts or omissions and breaches of fiduciary duty committed by Harmon Defendants, Mr. Gordon would not have agreed to allow the Harmon Defendants to use $1,000,000 of his funds to purportedly gain an interest in a real estate deal; would not have been charged an excessive fee; and would not have unknowingly paid to the Harmon Defendants a percentage of his total income.

Wherefore, Plaintiff Ben Gordon respectfully requests judgment in his favor and against all Defendants and for the recovery of the following damages:

(1)  For judgment against the Harmon Defendants, jointly and severally in an amount in excess of $1,000,000 as compensatory damages for the use of his funds to purportedly purchase a property interest;

(2)  For judgment against the defendants, jointly and severally, in an amount in excess of $1,000,000 as punitive damages;

(3)  For damages in connection with the excessive fees the Harmon Defendants charged Mr. Gordon;

(4)  For plaintiffs' costs of suit; and

(5)  For such other and further relief as the Court deems just.

## PLAINTIFFS DEMAND TRIAL BY JURY.

Respectfully submitted,

BEN GORDON

By: _____
One of his attorneys

George W. Spellmire, Jr.
James W. Davidson
SPELLMIRE & SOMMER
77 W. Wacker Drive, Suite 4800
Chicago, Illinois 60601
(312) 606-8721
Firm I.D. 39940

Aug-13-07  02:35pm  From-PHELPS DUNBAR           +5045689130          T-836  P.006/007  F-641
Jun 18 2007 1:44PM  HP LASERJET FAX                                                 p.1
05-18-2004  05:52PM  FROM-LARRY A ASSOCIATES              4915 797 24   T-427  P.003/004  F-004
Tel: (916) 797-2300                                                                 Fax(916) 797-303

LARRY HARMON

*Innovative Tax Solutions*

May 16, 2004

Mr. Ben Gordon

Dear Ben:

This letter is to confirm and specify the terms of our engagement with you and to clarify the nature and extent of the services we will provide (for your convenience, we have attached a partial listing of our menu of services).

We will provide detailed financial and tax consulting services for the duration of your playing career in the National Basketball Association ("NBA"). As discussed with your agent representative, we provide a comprehensive financial model and plan for managing our professional athlete client's finances for today and well into the future. Our intent is to work with our clients to ensure that they are financially secure for the duration of their lives and plan for the "passing" of such wealth for many generations to come.

Based on your current draft projections, as well as our understanding of the level of endorsement revenue that may be available to you, we are confident that through our unique tax and financial planning process we can save you monies well in excess of any fees you may pay us. It is always our position that we "pay for our ourselves."

As mentioned above, we offer a wide menu of services to all of our athlete clients (see menu of services attached), with the intent of being involved in every financial decision with our clients so that we can appropriately gain any tax and/or financial advantage or savings on such expenditure or purchase. Based on our understanding of what your financial picture could be, our estimated fees for our services are as follows:

1. Year 1 (commencing with the execution of this agreement) - $4,000 per month, plus out of pocket expenses (this represents a 33.33% discount of our fees for year 1 that we offer all new rookie clients).

2. Year 2 - $5,000 per month, plus out of pocket expenses. This amount represents a 16.67% discount of our fees that we offer all new rookie clients.

3. Year 3 and Year 4 (assuming team exercises it's option for Year 4) - $6,000 per month, plus out of pocket expenses.

4150 Douglas Blvd. · Suite 355 · Granite Bay · CA 95746



PLAINTIFF'S EXHIBIT A

Aug-13-07  02:35pm  From-PHELPS DUNBAR  +5045689130  T-836  P.007/007  F-641

Jun 18 2007 1:44PM  HP LASERJET FAX  P.2

05-18-2004  01:55PM  FROM-LARRY H  ASSOCIATES  +916 797 26..  T-427  P.002/004  F-864

Please understand that our fee schedule will be finalized upon the completion of the NBA draft when we have a better understanding of what services you will need.

Our fee for these services will be based upon the amount of actual time spent on your account at standard billing rates plus out-of-pocket expenses. All invoices are due and payable upon presentation.

After your rookie contract, we will evaluate the amount of work that we have performed on your account and provide you with a new engagement letter at that time.

By becoming a client of Larry Harmon & Associates, we have agreed to offer you a temporary line of credit (please see separate documentation enclosed) that will be available to you upon execution of this agreement.

If the foregoing fairly sets forth your understanding, please sign the enclosed copy of this letter in the space indicated and return it to our office.

We want to express our appreciation for this opportunity to work with you and look forward to a long-term relationship with you. If you have any questions, please do not hesitate to call me at (916) 797-2300 or on my cell phone at (916) 716-9060.

Sincerely,

Larry W. Harmon, CPA
President/CEO – Larry Harmon & Associates

Accepted By: _____

Printed Name: Ben Gordon

Date: 5/17/04

Witness: _____

Agent's Signature: _____

Aug-13-07  02:34pm  From-PHELPS DUNBAR           +5045689130      T-836  P.002/007  F-641
Jul 27 2007 4:03PM  HP LASERJET FAX                                              P.2
Jul-24-2007 02:39PM  FROM-LARRY HARMON & ASSOCIATES   +916 767 2024   T-121  P.001/004  F-428

## PROMISSORY NOTE

$1,000,000.00                              Date of Note:      February 12, 2007
                                           Place of Execution: Rocklin, CA 95765

**PROMISE TO PAY:** For value received, Vitalis Partners, LLC ("Vitalis") and it's Partners, Larry Harmon & Associates, P.A. and KCD Development, LLC along with its shareholders Larry Harmon and Kenny Cruz ("Borrower") promises to pay to the order of G7 Development, Inc. and/or its related entities or shareholder, BG4, Inc. and Ben Gordon ("Lender"), the principal sum of monies borrowed of One Million Dollars ($1,000,000) plus interest from the date hereof, with principal being payable in lawful currency of the United States of America in immediately available funds.

**INTEREST:** Prior to the occurrence of default or an event of default hereunder, interest shall accrue on the outstanding balance of this Note at the rate of Seventeen and a Half Percent (17.5%).

**PAYMENT:** Borrower agrees to pay 5% per annum monthly interest payments in the amount of $4,167.67 per month by the fifth (5th) of each month, with the remaining 12.5% of the interest due at the expiration of this note, being twenty four (24) months after the duly executed agreement. Both parties agree that an additional extension of time of up to twelve (12) months can be granted on such note. In the event that such extension is granted, then the original provisions of this note will extend for no longer than 12 months, or at which time borrower pays off the principal amount due, plus any outstanding accrued interest.

**PREPAYMENT:** Borrower may not prepay within the first twenty four (24) months of such note, as Borrower is guaranteeing such interest to Lender for a period of twenty four (24). In the event that both parties mutually agree to have such loan paid in advance, then such agreement would be covered in a separately executed agreement.

**COLLATERAL:** To secure the indebtedness evidenced by this Note, Borrower hereby assigns and grants to Lender a security interest in the following described property now owned or hereafter acquired by Borrower (the "Collateral"):

    A secondary security interest will be assigned to borrower on the project now known as Vitalis' South Bonnyview project to include approximately 22 acres in the Churn Creek

1



Area of Redding, California. Lender acknowledges that it has been provided with detailed information about such project including land maps, project site and project details. In the event that there are any changes to lot lines due to the development by Vitalis, Lender will be provided with updated information at that time.

**DEFAULT:** Borrower will be in default if Borrower fails to make any payment within forty five (45) days of its due date. A late charge in the amount of three percent (3%) of any payment required to be made hereunder shall be imposed on each such payment not received by the Lender within fifteen (15) days after it is due. The late charge is not a penalty, but liquidated damages to defray administrative and related expenses due to such late payment. The late charge shall be immediately due and payable and shall be paid by the Borrower to Lender without notice or demand.

**EXPENSES:** All parties liable for the payment of this Note agree to pay the Lender all costs incurred by it in connection with the collection of this Note. Such costs include, without limitation, fees for the services of counsel and legal assistants (including bankruptcy counsel fees and expenses) employed to collect this Note, whether or not suit be brought, and whether incurred in connection with collection, trial, appeal or otherwise.

**LENDER'S RIGHTS:** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid costs and fees immediately due, without notice, and then Borrower will pay that amount. Upon default, or if this Note is not paid at final maturity, Lender, at its option, may add any unpaid accrued costs and fees to principal and such sum will bear interest therefrom until paid at Eighteen Percent (18%) (the "Default Rate").

**RIGHT OF SETOFF:** Borrower authorizes Lender, to the extent permitted by applicable law, to charge, withdraw, or setoff all sums owing on this Note against any amount owed by Lender to Borrower.

**GENERAL PROVISIONS:** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intent to contract for, charge, collect, take, reserve, or receive (collectively referred to herein as "charge or collect") any amount in the nature of interest or in the nature of a fee for this loan that would in any way or event (including demand prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of California (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance due under this Note, and when the principal has been paid in full, be refunded to Borrower. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guaranties, or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, protest, and notice of dishonor, and all other demands and notices in connection with the delivery, acceptance, performance, default, or enforcement of this Note. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this

2

Note, whether as maker, guarantor, accommodation maker, or endorser, shall be released from liability. This Note constitutes the entire understanding and agreement of the parties as to the matters set forth in this Note and supersedes all prior understandings and correspondence, oral or written, with respect to the subject matter hereof. No alteration of or amendment to this Note shall be effective unless given in writing and signed by Lender. When this Note becomes due, by default, demand or maturity, Lender may, at its option, demand, sue for, collect, or make any compromise or settlement it deems desirable with reference to any collateral pledged or granted for this Note.

**TAXES; GOVERNING LAW.** Borrower agrees to be responsible for the payment of all taxes incurred by Lender in connection with this Note. Borrower hereby agrees that this Note shall be governed by the laws of the State of California without regard to conflicts of law principles, that venue for any dispute arising under this Note shall be Placer County, State of California and Borrower hereby consents to personal jurisdiction in Placer County.

PRIOR TO SIGNING THIS NOTE, BORROWER HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE AND ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THE NOTE.

By: _____  _____  2/12/07
    Larry W. Harmon, Member     Kenny Cruz, Member        Date
    Vitalis Partners, LLC        Vitalis Partners, LLC

By: _____  2/12/07
    Larry W. Harmon, President   Date
    Larry Harmon & Associates, P.A.

By: _____  2/12/07
    Kenny Cruz, Managing Member  Date
    KC Development Co., LLC

By: _____  2/12/07
    Larry W. Harmon, Individually  Date

By: _____  2/12/07
    Kenny Cruz, Individually  Date

3

Jul 25 2007 11:39AM  HP LASERJET FAX                                    p.4
JUL-24-2007 02:30PM  FROM-LARRY HARMON & ASSOCIATES  +918 787 8024  T-121  P.004/004  F-425

By: _____    _____
    Ben Gordon, President              Date
    G7 Development, Inc.

By: _____    _____
    Ben Gordon, President              Date
    BG4, Inc.

By: _____    _____
    Ben Gordon, Individually           Date

4

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – LAW DIVISION

| | |
|---|---|
| BEN GORDON, G7, INC., and BG4, INC. ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> VITALIS PARTNERS, LLC; LARRY ) <br> HARMON & ASSOCIATES, P.A.; KCD ) <br> DEVELOPMENTS, LLC; LARRY ) <br> HARMON; and KENNY CRUZ ) <br> ) <br> Defendants. ) | No. |

### AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222(b)

James W. Davidson, being first duly sworn on oath, deposes and states as follows:

1. I am one of the attorneys for Plaintiffs in this cause.

2. The total amount of money damages sought in this cause exceeds $50,000.

Further, affiant sayeth naught.

_____
James W. Davidson

Subscribed and sworn to before me
this 19th day of September, 2007.

_____
Notary Public

"OFFICIAL SEAL"
FELICIA GRACE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 06/28/2010